## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RONAN MCCABE, | ) | |
| RANDA HERRING, | ) | |
| JON DUSTIN STONE, | ) | CIVIL ACTION NO. |
| ADAM DEUEL, and | ) | |
| MINH VO, | ) | 1:12-cv-02494-MHC |
| Individually, and on behalf of | ) | |
| all others similarly situated, | ) | [PUTATIVE CLASS ACTION] |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAIMLER AG and | ) | |
| MERCEDES-BENZ USA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

CONLEY GRIGGS PARTIN LLP
Cale Conley
Georgia Bar No. 181080
Ranse M. Partin
Georgia Bar No. 556260
The Hardin Building
1380 West Paces Ferry Road
Suite 2100
Atlanta, Georgia 30327

WIGINGTON RUMLEY DUNN &
RITCH, L.L.P.
Joseph M. Dunn
Texas Bar No. 06245650
601 Howard Street
San Antonio, Texas 78212

*COUNSEL FOR PLAINTIFFS*

Defendants' committed classic fraud, and not just to these named Plaintiffs, but to a whole class of Mercedes owners.  Defendants realized they had a defective part in their cars, failed to disclose it, hid their attempts to fix it, and duped car owners into paying for the repair.  This is fraud in every state at issue.

## I.  <u>INTRODUCTION</u>

Defendants' E-Class cars (model years 2003-2009) placed the gas tank beneath the rear seat, with pressurized fuel pumped through two openings in the top of the tank.  The two openings are sealed by rubber O-ring gaskets.  The top of the gas tank sits under the rear seat of the vehicle.  No air-tight or liquid-tight container separates the leaking seals on the top of the fuel tank from the sound deafening material (jute) and foam cushion inside the rear seat.  As a result, once the fuel gaskets degrade, fuel (in vapor and liquid form) escapes the high pressure fuel system due to the defective gaskets, enters the passenger compartment, and condenses in the memory foam and jute under the rear seat.

As the gaskets began leaking, thousands of Mercedes owners across the country started reporting smelling gas inside their cars, some even reporting liquid fuel puddling beneath their rear seat on the top of the gas tank.  Defendants admit this ████████████████.  (Kempka Dep. at 92:23-93:3).

Without disclosing it, Mercedes altered the gaskets over the course of a few years, apparently trying to fix the fuel leaks, all the while maintaining to Mercedes owners and the U.S. Government that there was no defect in the E-Class fuel system.  Mercedes instructed some of its dealers to conceal the gas smell by spreading coffee grounds beneath the rear seat, without disclosing this to the owner.[1]

Mercedes has replaced – largely at the car owners' expense – gaskets constituting roughly 25% of the gaskets originally placed in E-Class cars from model years 2003 and 2009.  But Mercedes continues to deny there is a problem, and charges the vehicle owners to replace these gaskets, $200 - $300 in each case. In other cases, Mercedes dealers tell the vehicle owners that their entire fuel tank needs replacing, at the owners' expense, which costs $1500 or more.  Even when legitimate work is performed to replace other defective and/or malfunctioning parts of the fuel system, Mercedes uses this opportunity to charge the owners for replacing the defective gaskets.[2]  Defendants' omissions and false representations -

---

[1] Robert Shipley Depo., pp. 87-92 ("It was very clearly told not to explain that we put coffee grounds inside the vehicle to solve the problem." p. 90)(former Mercedes service advisor).

[2] As one example, see Exhibit A (Declaration of Donald Murray, a non-party Mercedes owner.)

2

- saying there was no defect when they knew there was -- pushed the cost of replacing these gaskets onto the vehicle owners rather than Defendants.

Defendants' motion offers a series of arguments addressed to each individual Plaintiff.  Defendants claim a variety of things that the Plaintiff should have done differently -- calling Defendants before purchasing their vehicles, not buying cars from individuals rather than Mercedes dealerships, or overfilling their gas tanks.  In doing so, Defendants undoubtedly hope to distract from their common scheme that is the core of this case.  Defendants' tactic is to distract from any focus on their own failings by instead blaming the individual Plaintiffs.  Any explanation for, or even reference to, Defendants' conduct is omitted.

The real issue before the Court is what Defendants failed to do: disclose that they had designed a defective part in an entire class of vehicles.  Each Plaintiff presented his or her vehicle to a Mercedes dealership because of the noxious gasoline smell inside their cars.  Each of these encounters presented Defendants with an opportunity to acknowledge and address the problem the right way.  Instead, Defendants kept silent and charged each Plaintiff for the repair.  As demonstrated below, Defendants have defrauded the individual Plaintiffs, as well as the class of owners of these E Class cars.  Defendants are not entitled to summary judgment.

## II.    UNDERLINE{FACTUAL BACKGROUND}

### A.    Defendants' Fraudulent Scheme

Mercedes Benz USA ("MBUSA") is the U.S. sales arm for its parent

company, Daimler, a German corporation, which designs and manufactures

Mercedes vehicles.  For model year 2003, MBUSA rolled out the model W211, a

new version the E-Class.  All W211 cars have the same fuel system.[3]  Defendants

sold or leased 281,727 W211 E-Class cars in the US for model years 2003-2009.[4]

The W211 fuel tank includes two seals, or gaskets;[5] one fits around each fuel

pump on the top of the fuel tank.  The same gaskets are in all 2003 to 2009 E-Class

cars, (Kempka Dep. at 12:2-9), apart from the changes in the material used to make

the gaskets and small changes in their shape discussed below.  The gaskets sit

inside recessed openings in the top portion of the fuel tank.  See Exhibit B

(MBUSA007423).

---

[3] See Exhibit B (**filed under Seal**), McCabeMBUSA7422-7423 (documents
produced by MBUSA to NHTSA; page 7423 also depicts the fuel tank system at
issue with applicable parts labeled)

[4] Exhibit C (Oct. 31, 2013 letter from MBUSA's counsel to NHTSA, p. 2).

[5] "Seal" and "gasket" are used interchangeably throughout Defendants' documents
and testimony, but both refer to the two rubber "O-rings" in the top of the fuel
tank.  (Kempka Dep., p. 11).  Each gasket is roughly large enough to encircle an
adult fist.



(Photograph depicting top of fuel tank, which lies beneath the rear passenger seat, and showing two round holes, each of which is to be sealed by the O-ring gasket) (McCabeMBUSA007442)

The gaskets are ███████████████████████████████. See

Exhibit D (**filed under seal**) (MBUSA 007410-7414) Daimler has always

recognized ████████████████████████████████████.

(Kempka Dep. at 14:4-11).  But when the W211 first went into production in 2002,

Daimler had the ███████████████████████████ ("ECO"),

(Kempka Dep. at 14:12-19).  Daimler used an ECO gasket despite ████████

████████████████████████████████████████

█████████████████████████████.[6]  The more fluorine

---

[6] Kempka Dep. at 32:7-13; Ex. 3 to Kempka Dep. (████████████████████

████████████████████████████

████████████████████████████

in the rubber, the more resistant it is to gasoline.  See Exhibit E (Dunn Aff. ¶ 8).

Daimler admitted that ███████████████████████████████████████

████████████████████████.  (Kempka Dep. at 31:14-32:5).

Unfortunately for E-Class owners, the ECO gaskets were not sufficiently fuel resistant to withstand submersion in gasoline.  The inadequacy of the ECO gaskets became evident as more and more owners began complaining of fuel odor inside their cars and fuel leaks.

In the meantime, Defendants had been secretly changing the design, material, and supplier of the leaking gaskets.  In November ███████████████

████████████████████████████████████████████████████

███████████████████████████████████████████.

(Kempka Dep. at 27:2-10; 30:24-31:21; Kempka Dep. Ex. 4)  Defendants admit this material change ███████████████████████████████

████████████████████████.  (Kempka Dep. at 31:3-21; *see also* Exhibit E, Dunn Aff. ¶ 8).

In December ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████.  See Exhibits F (**filed**



Chemistry and Technology, vol. 49 (1975), pp. 789-790); See Exhibit E, Dunn Aff. ¶ 7.

**under seal)** and E (MBUSA 007083; Russell Dunn Aff. ¶ 5).  A higher fluorine content improves the polymer's resistance to gasoline.  See Exhibit E (Dunn Aff. ¶ 8).  Mercedes did not disclose these changes to the gaskets.

In investigating the cause of the fuel leaks for this lawsuit, Plaintiffs retained a chemist and polymer expert to test these three different generation of gaskets: Russell Dunn, Ph.D., P.E., of Vanderbilt University.  Dr. Dunn's testing on the gaskets' chemical composition showed that the first generation, ECO gasket contained zero fluorine.  See Exhibit E (Dunn Aff. ¶ 3).  Dr. Dunn's testing revealed the changes in the gaskets' material noted above, made in 2004 and 2007, which had not previously been disclosed.  Each change increasing the amount of fluorine.  See Exhibit E (Dunn Aff. ¶¶ 3-6; *see also* Exs. 7-9 of Kempka Dep., Mercedes' schematic design drawings showing these design changes for the gaskets).  Documents finally obtained from Defendants in discovery, and produced by Defendants only subject to a protective order, stamped "Confidential," confirm these changes.

REDACTED

(Ex. 5 to Kempka Dep., marked by Defendants as Confidential)

As shown, Defendants also changed the supplier of the gaskets in 2007, and made an additional change in the gaskets' shape and tolerances in 2008.  (Ex. 5 to Kempka Dep.)

In 2008, Defendants issued a recall, albeit a narrow one, for all AMG (high performance versions) of W211 cars for model years 2003-2006.  See Exhibit G (March 2008 letter to Mercedes owners, McCabeMBUSA6681).  Defendants initiated the recall following "customer complaints of fuel smell" See Exhibit H (Recall Campaign Bulletin, McCabeMBUSA6671).  Neither the recall bulletin sent to Mercedes' dealers, nor the recall letter sent to Mercedes' owners, limits the recall to owners of cars still within warranty or to owners who purchased from authorized Mercedes dealers.  Yet despite having made three changes to the gasket, and changing supplier, Defendants did not inform Mercedes owners that the gasket could be the cause of the fuel smells.  To date, Mercedes has not expanded its recall to include regular E-Class cars.  Moreover, in spite of the limited recall, Defendants continued to, and continue to this day, to charge Mercedes owners for replacing the defective fuel gaskets when the car is out of warranty.  See Exhibit I (sample declarations from Mercedes owners charged to replace these parts).

In February 2012, the E-Class fuel leak problem had become so widespread that the U.S. Department of Transportation's National Highway Traffic Safety

Administration ("NHTSA") Office of Defects Investigation opened Preliminary

Evaluation 12-001 to investigate allegations of fuel leakage at the top of the fuel

tank in the 2003-2006 E-Class vehicles manufactured for sale or lease in the U.S.

See Exhibit J (MBUSA 006695).  NHTSA had received numerous complaints

from E-Class owners.  The similarity in the complaints was striking:  "an

incredibly strong smell of gas inside the car" See Exhibit K (McCabeDAG350), "a

strong odor of raw gasoline in the interior of the vehicle emanating from the rear

seat area" See Exhibit L (McCabeDAG351), "a terrible oder [sic] of gas would

permeate the whole interior of the car" See Exhibit L (MCabeDAG351), and

"noticed fuel leaking under the back seat" See Exhibit M (McCabeDAG353).

For NHTSA's investigation, Mercedes performed a search of warranty

claims, for just 2003-2006 E-Class vehicles.  (D. Edwards Dep. at p. 112:6-

113:19).  Mercedes limited the search terms to certain damage codes, 04 (leak) and

65 (odor).  The spreadsheet, put together by Mercedes for NHTSA, although not

numbered, appears to contain in excess of 8,000 warranty claims made by

Mercedes owners, of just 2003-2006 E-Class vehicles, for just the damage codes of

"leak" and "odor".  This does not include 2007-2009 warranty claims, nor does it

include owners out of warranty who experienced fuel leaks.

Also in response to NHTSA's investigation, Defendants produced a spreadsheet showing the number of parts that had been sold to replace parts in the W211 fuel system.  See Exhibit N (MBUSA 006689).  The spreadsheet reveals that Defendants sold over a hundred thousand replacement gaskets to dealers:  17,312 of the first generation, ECO gaskets (part no. A2034710179) from January 2002 through August 2005; 37,136 of the second generation, fluorocarbon gasket (part no. A2034710379) from November 2004 through July of 2008; 82,186 of the third generation, higher-fluorine-content gaskets (part no. A2114710579) from April 2008 through March 2012.  See Exhibit O (MBUSA 006705) Thus, the total number of replacement gaskets sold, as of March 2012, was 136,634 in a population of 281,727 vehicles.  See Exhibit C (Oct. 31, 2013 letter from MBUSA counsel to NHTSA, p. 2) Each car has two fuel gaskets, so 136,634 replacements represents 68,317 cars that needed their fuel gaskets replaced.  In a population of 281,727 cars, that is a replacement rate of nearly one in every four cars.  Notably, the number of fuel gaskets sold is more than four times the next highest part ordered for replacement in W211 vehicles.  See Exhibit O (MBUSA 006705-09).

The number of replacement gaskets sold is even more astonishing because Daimler represents ████████████████████████████████████

█████" (Kempka Dep. at 47:19-22).  Defendants represent to prospective buyers

10

and owners ███████████████████████████████████

████████████████████████████. See Exhibit P (**filed under seal**) (MBUSA

007335; Kempka Dep. at 123:13-18; 133:10-16).  Yet these gaskets leak at 40,000

and 50,000 miles.  See Exhibit Q (service records of Plaintiff Vo, replacing seal

ring at 57,000 miles)

The original ECO gasket was defective in that it was not sufficiently fuel-

resistant, particularly in a fuel system in which the gasket was submerged in fuel.

Although Defendants initially replaced the ECO gasket with a fluorine-rubber

gasket, that replacement gasket also leaked.  Defendants then apparently sought to

remedy the problem by adding more fluorine to the material.  See Exhibit E (*See

generally* Dunn Aff.)

Defendants also increased ███████████████████████████

█████████████████████████████████████████████. A

material's "shore value" is the international designation for the hardness of an

object.  (Kempka Dep. at 54:22-25). ███████████████████████

███████████████████████. See Exhibit R (**filed under seal**) (DAG 000001).

███████████████████████████████████████

███████████████████████████. See Exhibit S (**filed under seal**)

(DAG 000003; *see also* Exs. 7-9 of Kempka Dep., internal Mercedes schematic drawings for the gaskets showing shore values).

Plaintiffs filed this lawsuit in July 2012, after several of them had been unable to get Defendants to pay for the repair of what they believe was a defect in the design of their cars causing fuel leaks and fuel smells.  Through researching on-line and internet forums for Mercedes vehicle owners, several of the Plaintiffs came to understand that the fuel leak problems they were experiencing were widespread.

Plaintiffs' concerns were shared by NHTSA. In March 2013, NHTSA elevated its Preliminary Evaluation to an Engineering Analysis investigation because ███████████████████████████████████████████████████████ ██████████. (Kempka Dep. at 103:15-104:14).  NHTSA received nearly 400 consumer complaints from across the country -- people who took the time to actually file a complaint with a federal agency.  NHTSA also expanded the model years included in its investigation to include the 2007 and 2008 E Class.  See Exhibit T (MBUSA006736-006737).  NHTSA's investigation, which is on-going, is focused on "the complainants alleged fuel leaks or a strong odor of gasoline both inside and outside of their vehicle, particularly after refueling."  See Exhibit T (MBUSA006736-006737) These complaints are identical to the complaints

expressed by the Plaintiffs in this lawsuit, as well as by numerous other potential

class members who have learned about this lawsuit and contacted Plaintiffs'

counsel, a small sample of which are included in attached declarations. See Exhibit

I (Declarations of non-Plaintiff Mercedes owners regarding fuel smells in their E-

Class cars and out-of-pocket costs for repairs, all describing the same fuel smell

issue)

     Defendants did not inform NHTSA, the Plaintiffs, or the public of ███

█████████████████████████. Instead, Defendants mislead the public

and NHTSA.  In response to direct questioning from NHTSA regarding the

material(s) used in its gaskets, Defendants stated ███████████████████

██████████████████████) See Exhibit U (**filed**

**under seal**) (MBUSA 007351).  As Dr. Dunn's testing described above revealed,

this was not true, as the first generation gaskets contained no fluorine.

     Defendants' efforts to conceal the changes to the gaskets continued in their

deposition testimony in this litigation.  Defendant Daimler's corporate

representative, Franz-Heinz Kempka, head of Daimler's fuel systems department,

was heavily involved in Defendants' ████████████████████.

(Kempka Dep. at 98:3-17).  During Mr. Kempka's deposition, Plaintiffs' counsel

asked about Defendants' written responses to NHTSA's information request.

13

MBUSA knew that these requests were ████████████████████████████████

████████████████████████.[7]  NHTSA specifically asked Defendants █

████████████████████████████████████████████████████████████████

████████████████████."[8]  Defendants' response to NHTSA ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.[9]

        When presented at his deposition with Defendants' response to NHTSA, Mr.

Kempka was forced to admit ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.  (Kempka Dep., p. 144:19-24).

Mr. Kempka testified that Defendants ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.  (Kempka Dep. at

144:15-145:16).  Defendants immediately requested a break, and after 20-minutes,

during which Mr. Kempka met with counsel, and now in response to questions

---

[7] Kempka Dep. Ex. 19, p. 1, Response from MBUSA's regulatory counsel to
NHTSA information request, noting model years at issue.

[8] Kempka Dep. Ex. 19, p. 11, Response from MBUSA's regulatory counsel to
NHTSA information request (underlining added).

[9] Kempka Dep. Ex. 20, Attachment 18d, p. 351 (page 17 of 35 page PDF file).

from Defendants' counsel, Mr. Kempka changed his testimony, ███████████

████████████████████████████████████████████████████████████

█████████████████. (Kempka Dep. at 154-155).

     Under subsequent cross-examination by Plaintiffs' counsel, however, Mr.

Kempka could not recall ████████████████████████████████████████

█████████████.  After being reminded that there were criminal penalties for

perjury, Mr. Kempka changed his testimony back to his original answer, and again

admitted that █████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████." (Kempka Dep. at 170).  Mr. Kempka also confirmed that

████████████████████████████████████████████████████████████

████████████████████████. *Id.*

     Weeks after his deposition, Defendants' counsel sent an errata sheet wherein

Mr. Kempka again changed his answer back to "███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████." See Exhibit V ( Kempka

Dep. errata sheet).  Again, Mr. Kempka does not supply a name for this supposed

NHTSA official.

In the meantime, the number of Mercedes owners experiencing leaking fuel, in both liquid and vapor form, continues to mount. As a small sample, Plaintiffs have obtained a number of declarations from other, non-Plaintiff owners of the E Class vehicles at issue who are also experiencing fuel leaks. See Exhibit I (attached owner Declarations). Despite the thousands of customer complaints, and over 136,000 gaskets having to be replaced, Defendants represented to NHTSA that ███████████████████████████████████████████████████ ███████████████████████." (Kempka Dep. at 67:17-68:15).

**B.     The Individual Plaintiffs' Experiences**

Given these efforts at concealment, it is not surprising that Mercedes dealerships around the country refused to acknowledge the defect when Plaintiffs presented their vehicles complaining of leaking fuel. Each Plaintiff had to pay for his or her own gasket replacement. In some cases, owners were told their entire fuel tank needed to be replaced, at a cost of $1500 or more.

Plaintiff Ronan McCabe owns a 2006 E55 AMG built in November 2005. The vehicle was produced with the second generation, low-fluorine gaskets. After noticing a strong gasoline smell inside of his car, Mr. McCabe took the vehicle in for repairs in January 2012 at Atlanta Classic Cars, an authorized Mercedes dealership. (McCabe Dep., p. 54:2-12; 60:6-16). The dealer replaced both fuel

16

gaskets with the newer, high-fluorine gasket.  The price for the two gaskets, or seal rings, was $37.38 and the labor cost for replacement of the gaskets was $250.00. See Exhibit W (McCabe000168).

Plaintiff Randa Herring owned a 2006 E500.  The vehicle was produced with the second generation, low-fluorine gaskets.  After noticing a strong gasoline smell inside of her car, Ms. Herring took the vehicle in for repairs in July 2012 at Mercedes-Benz of South Atlanta, an authorized Mercedes dealership.  Ms. Herring was quoted a price of $2,896.64 to replace both fuel level senders, gaskets, covers, and the fuel tank.  Ms. Herring instead elected to trade in her vehicle.  (Herring Dep., p.26:24-28:2).  The dealer deducted $3,937 from the trade-in value of the vehicle, specifically to reflect the diminished value of the vehicle due to the fuel smell and fuel system defects.  See Exhibit X (McCabe000245).

Plaintiff Dustin Stone owned a 2007 E Class AMG which was built in August 2006.  The vehicle was produced with the second generation, low-fluorine gasket.  In January 2012 Stone noticed a gas smell inside his car and took the vehicle in for repairs at Mercedes Benz of Plano, an authorized Mercedes dealer. (Stone Dep., p.62:20-63:5).  The work performed on his vehicle included the replacement of both gaskets with the third generation, high-fluorine gaskets and replacement of the fuel sending unit.  The price for the two new gaskets was

$19.50 each, or $39 total, plus $333.20 for labor for the replacement of the gaskets and sending unit.[10]  See Exhibit Y (Stone21244-000001-21244-000003).

Plaintiff Adam Deuel owns a 2004 E500W built in April 2004.  The vehicle was produced with the first generation, ECO gasket.  In August 2012, Mr. Deuel detected a strong gas smell inside his car and took it for repair to Mercedes Benz of Houston North.  The dealer replaced both fuel gaskets with the third generation, high-fluorine gasket, as well as replacement of other parts.  The price for the two new gaskets was $19.50 each, or $39 total, plus $660 for labor for the replacement of the seals and other parts.[11]  See Exhibit Z (McCabe000363-000365).

Plaintiff Minh Vo owns a 2005 E55 AMG.  The vehicle was produced with the second generation, low-fluorine gaskets.  Mr. Vo took the vehicle in for repairs on March 14, 2011 at Mercedes-Benz of Arlington after noticing a strong gas smell inside the car.  (Vo Dep., p. 99:4-21).  The dealer replaced both gaskets with the

---

[10] The work on Mr. Stone's vehicle was covered by an after-market extended warranty that he purchased from a third-party, other than Defendants.

[11] Plaintiff Deuel has moved addresses, has a new cellular number and e-mail, and is not currently in contact with Plaintiffs' counsel.  He is the subject of a pending motion by Defendants to sanction Mr. Deuel for producing his car for inspection, with Defendants seeking dismissal of his individual claim *with* prejudice.  [Doc. 121].  Plaintiffs oppose the sanctions sought, in light of Mr. Deuel having appeared for his deposition and responded to interrogatories and document requests.  [Doc. 123]  Plaintiffs request that the Court dismiss Mr. Deuel's claims *without* prejudice so that he remains a member of the putativE-Class.

newer high-fluorine gaskets.  The price for the two gaskets, or seal rings, was

$37.38 and the labor cost for replacement of the gaskets was $250.00. See Exhibit

Y (Stone21244-000204-21244-000206).  Mr. Vo also owns a 2006 E500 for his

wife.  The vehicle was produced with the second generation, low-fluorine gaskets.

Although Mr. Vo continues to experience a strong fuel smell in his E500, even

after repairs made while the car was under warranty, he has not yet presented it for

additional repairs.  (Vo Dep., p.73:9-15).

## III.    ARGUMENT AND CITATION OF AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  "[T]he moving party has the burden of

meeting this exacting standard."  *GE Life & Annuity Assur. Co. v. Barbour*, 191 F.

Supp. 2d 1375, 1380 (M.D. Ga. 2002).

> In assessing whether the movant has met this burden, the courts
> should view the evidence and all factual inferences therefrom in the
> light most favorable to the party opposing the motion. All reasonable
> doubts about the facts should be resolved in favor of the non-movant. .
> . . If reasonable minds might differ on the inferences arising from
> undisputed facts, then the court should deny summary judgment.

*Id*. at 1381 (quoting *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1369

(11th Cir. 1997)).

19

Fraud claims are particularly inappropriate for summary judgment:

> The species of fraud are numberless, and like a chameleon, fraud is always colored by the context from which it arises. For that reason, it is usually for the jury to determine from the facts of a specific case, whether a fraud was committed.  Fraud is seldom, if ever, provable by direct testimony, but usually must be shown by circumstances which are sufficient to convince fair-minded men that they would not have occurred without the existence of a fraudulent purpose and design. ***Fraud is a mixed question of law and fact but, in most cases, is a jury question***."

*Hirschberg v. G. W. Motors, Inc*., 34 Va. Cir. 55, 60 (1994)(emphasis added).

### B.      The Elements of Fraud

The elements of fraud are the same in the three states at issue, although stated slightly differently.  In Georgia, fraud requires: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages. *ReMax N. Atlanta v. Clark*, 244 Ga. App. 890, 537 S.E.2d 138, 141 (2000).  In Texas, fraud  occurs when:  "[(1)] a party makes a material misrepresentation, [(2)] the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, [(3)] the misrepresentation is made with the intention that it should be acted on by the other party, and [(4)] the other party acts in reliance on the misrepresentation and thereby suffers injury.  *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001).  In

Virginia, "fraud requires an intentional, knowing misrepresentation by a defendant of a material fact upon which a plaintiff has relied to its detriment."  *Murayama 1997 Trust v. NISC Holdings, LLC*, 727 S.E.2d 80, 86 (Va. 2012).

All three states recognize that under appropriate circumstances *concealment* of a material fact constitutes fraud to the same extent as an affirmative misrepresentation. [12] Defendants' motion recognizes this law but argues that Defendants had no obligation to disclose the existence of the defect in the W211 E-class vehicles to Plaintiffs.

Defendants also make a variety of other arguments on various elements of fraud.  Although Defendants parse out their arguments for each individual Plaintiff, in reality those arguments are largely common to all Plaintiffs.  Plaintiffs will address the elements of fraud first, showing genuine issues of material fact on each element.  To the extent Defendants raise an argument unique to individual Plaintiffs, it will be noted.

---

[12] *See Rivers v. BMW of N. Am., Inc.,* 214 Ga.App. 880, 449 S.E.2d 337, 340 (1994)("Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover."); *Bradford*, 48 S.W.3d at 755 ("silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent"); *Murayama 1197 Trust*, 727 S.E.2d at 86 ("Concealment of a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if existence of the fact were expressly denied.").

**C.    Evidence Exists to Create A Genuine Issue of Material Fact On Defendants' Duty to Disclose (All Plaintiffs)**

Defendants' most pervasive theme, against all Plaintiffs, is that they had no duty to disclose any defect in the fuel system.

As an initial matter, Defendants continue to challenge Plaintiffs' underlying legal theory – that Defendants had a duty to disclose the defect to Plaintiffs and the class of owners – when the Court has already upheld this theory, subject to the facts bearing out the allegations.  [Doc. 46, Order denying Motion to Dismiss]  Judge Batten ruled that "[t]he obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." *Id.* The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of "intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover." [Doc. 46, published at *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368 (N.D. Ga. 2013), *citing Rivers v. BMW of N. Am., Inc.,* 214 Ga.App. 880, 449 S.E.2d 337, 340 (1994)]  Like the undisclosed damage and repairs at issue in *Rivers,* the defects in the gasoline tanks of the vehicles McCabe and Herring purchased were 'intrinsic qualities' that could not have been discovered through the exercise of ordinary prudence and caution. Therefore, McCabe and Herring

have plausibly alleged that Defendants omitted a material fact that they had a duty to disclose under Georgia law.

[Doc. 46, *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368 (N.D. Ga. 2013)].

During discovery, and with the aid of Dr. Dunn, the Ph.D. chemist at Vanderbilt, Plaintiffs established that Defendants made multiple changes to the gaskets.  Plaintiffs also established that Defendants failed to disclose this information to Plaintiffs, and the entire class of Mercedes owners.  Tellingly, Defendants do not deny their failure to disclose the changes to the gaskets.  Thus, Plaintiffs have established that Defendants omitted a material fact that they had a duty to disclose based on the intrinsic qualities of the part at issue that could not have been discovered through ordinary diligence.  At a minimum, a jury question exists as to whether the particular circumstances of this case created a duty to disclose, as recognized by the Georgia Court of Appeals in *Rivers*.

The legal issue of whether Plaintiffs' fraud theory "worked" was decided in this Court's order denying the motion to dismiss.  The issue before the Court now at summary judgment is whether the *facts* obtained in discovery create a question of fact for a jury.  Clearly, they do.

The disclosure duty may arise from various circumstances.  *See, e.g.*, O.C.G.A. § 23-2-53 ("Suppression of a material fact which a party is under an

obligation to communicate constitutes fraud.  The obligation to communicate may arise from… the particular circumstances of the case."); *Hirschberg v. G. W. Motors, Inc*., 34 Va. Cir. 55, 57 (1994) ("The duty of a party to reveal material facts of which he has knowledge depends upon the circumstances of each case and the relationship between the parties.").  In business transactions, courts have generally recognized that a duty to disclose may arise when a party has superior knowledge of a matter that is not equally accessible to the other party.[13]

Courts recognize that the obligation to disclose known facts may arise "in various ways in various cases":

> Generally speaking, however, in the conduct of various transactions between persons involving business dealings, . . . there are times and occasions when the law imposes upon a party a duty to speak rather than to remain silent in respect of certain facts within his knowledge, . . . In such a case a failure to speak amounts to a suppression of a fact which should have been disclosed, and is a fraud. . . .

> Among other ways, the obligation to communicate facts may arise from the fact that one of the parties has superior knowledge or means of knowledge . . .

*Hirschberg*, 34 Va. Cir. at 57-58.  When parties engage in a transaction, one of the primary ways that an obligation to disclose may arise is in a situation of unequal

---

[13] *See, e.g., Hidden Values, Inc. v. Wade*, 2012 WL 1836087 *9 (N.D. Tex. May 18, 2012) (concluding that "under Texas law, a duty to disclose can exist absent a fiduciary relationship when a party does not have an equal opportunity to discover material information withheld").

knowledge.  This is particularly true where the knowledge is peculiarly within the grasp of one party but unknowable to the other.  *Id*.  The purpose of disclosure in such a situation is to place the parties on an equal footing, so that the party with unequal knowledge will be able to fairly judge whether to enter into the transaction.  *Id*.

For example, in *Hirschberg* the plaintiff purchased a car with approximately 10,000 miles.  The defendant dealership told the plaintiff that the car had been driven by one of the dealership's owners and was a "new car."  The defendant did not disclose to the plaintiff that the car had been repaired and repainted as a result of vandalism, which the plaintiff learned two years later when she attempted to trade the car.  *Hirschberg*, 34 Va. Cir. at 55-56.  On these facts, the court denied summary judgment to the defendant on the plaintiff's fraud claim, finding that the question of fraud was for the jury.  *See also GE Life & Annuity Assur. Co*., 191 F. Supp. 2d at 1383 (denying summary judgment on fraud and concealment claim and finding that ***"issue of whether there was a duty to disclose . . . is more appropriately a question for the jury"***) (emphasis added).

Ultimately, *Hirschberg* concluded that a jury could find under the circumstances presented "that the automobile dealer had superior knowledge about the prior damage or was required to speak to correct Plaintiff's mistaken belief

about the vehicle's condition, in which case a duty to disclose the information concerning the repainting may have been triggered." *Id*. at 59.

The Georgia Court of Appeals' decision, relied upon by Judge Batten, *Rivers v. BMW of N. Am., Inc*., 214 Ga. App. 880, 449 S.E.2d 337, 340 (1994), is similar. There, the court recognized that the "particular circumstances of the case may give rise to an obligation to communicate where there is a ***concealment of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover***." *Rivers*, 449 S.E.2d at 340 (emphasis added). Ms. Rivers purchased a new car that—not disclosed by either BMW or the dealer—had been repainted due to acid rain damage. *Id*. at 338-39.  The trial court granted summary judgment to defendants BMW and the dealer on Rivers' fraud claim. *Id*. at 339. The Court of Appeal reversed.

The *Rivers* court stated that "[c]oncealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover." *Id*. at 340.  Accordingly, the court found that there was ample evidence to raise a jury question as to whether BMW "willfully concealed what it knew" or the dealership "recklessly failed to

ascertain the truth or falsity, of the representation it made, as to the intrinsic quality of the merchandise sold." *Id*.

*Rivers* and *Hirschberg* demonstrate that courts are uneasy with situations in which an automobile seller or manufacturer abuses its position of superior knowledge or information about the vehicle by concealing facts about the character or quality of the vehicle that are unknowable to a purchaser. Here, ample evidence exists that Defendants engaged in just such a practice. Defendants are the manufacturer and distributor of a class of vehicles that contain a common defect. That defect relates to the ability of the fuel system to effectively seal due to the use of gaskets that were made from materials that are not effectively fuel-resistant. [14] This problem was exclusively within the knowledge of Defendants and is not of the type that a reasonable consumer could discover. As Defendant Daimler's representative conceded, ███████████████████████████████████████ ███████████████████████████████████████. (Kempka Dep. at 92:23-93:3). Yet all of the evidence indicates that Defendants failed to disclose this information to the consuming public and, indeed, actively sought to conceal it.

---

[14] *See generally* Exhibit E Dunn Aff. Defendants filed their summary judgment motion prior to the start of expert discovery. Thus, Plaintiffs present with their response an affidavit from one of their experts, Russell Dunn, Ph.D., P.E. of Vanderbilt University, in support of their opposition. Dr. Dunn will continue to prepare a full report for use at trial.

The changes in the gaskets were secret attempts to fix a defect in the original production of the vehicle, thus a defect that was present within the warranty period. Notably, Defendants do not argue in their motion that the vehicles did not contain a defect, nor do Defendants dispute their knowledge of same.  By not disclosing this latent defect, Defendants pushed the cost of the predictable repairs that would ultimately need to be made due to the gaskets made from rubber that was not sufficiently resistant to gasoline, and would degrade over time at a much faster pace that the 150,000 miles minimum expected lifetime.

Former Mercedes service advisor Robert Shipley testified that these fuel leaks with the E-Class were a commonly known problem within MBUSA. (Shipley Dep., pp. 29-31, 92).  He was instructed by an MBUSA regional supervisor to conceal the fuel smell with coffee grounds in order to delay replacing the rear seat.  (*Id.* at 87-90).  Replacing the rear seat once the foam cushion absorbed the leaking fuel would cost Mercedes approximately $4,000 if done under warranty.  (*Id*. at 74).  MBUSA instructed the dealer to cover up the fuel smell with coffee grounds so as to delay the repairs.  (*Id*. at 91-92).  Once the warranty expired, the cost would have to be borne by the car owner.  Any Mercedes owner who paid to have a defective gasket replaced has been defrauded.

The experiences of the individual Plaintiffs when they complained to Mercedes authorized dealers about their vehicles leaking fuel also evidence Defendants' concealment.  In each instance, Defendants withheld information about the defects, making Plaintiffs pay for the repairs.[15]  Defendants have also refused to acknowledge any defect to NHTSA, which in turn would disclose the defect to the public and Plaintiffs.

Given a product manufacturer or distributor's unique access to knowledge of its products, it makes sense that courts would impose duties on them not to conceal defects from the consuming public.[16]  Yet, Defendants disclaim any such

---

[15] *See Tietsworth v. Sears, Roebuck and Co*., 720 F. Supp. 2d 1123, 1134-35 (N.D. Cal. 2010) (fraudulent concealment claim properly alleged where plaintiffs alleged evidence of active concealment in that they contacted defendant for service of defective machines and were told there was no defect and denied free service or replacement parts).

[16] For example, in *Woods v. Maytag Co*., 807 F. Supp. 2d 112 (E.D.N.Y. 2011), the court allowed a consumer's claim for fraudulent concealment against ***the manufacturer*** of an oven to proceed.  The consumer alleged that the manufacturer owed a duty to disclose by virtue of its superior knowledge that its ovens had a defect in the igniter which caused it to routinely malfunction by exploding and catching fire, creating a risk to consumers.  *Id*. at 124.  The Woods court recognized that under New York law a party to a business transaction has a duty to disclose "where one party possesses superior knowledge, not readily available to the other, and know that the other is acting on the basis of mistaken knowledge." *Id*.  The court further recognized that ***"[a]lthough normally this duty to disclose arises in the context of direct business transactions, courts have also imposed this duty on a manufacturer who has exclusive knowledge of a product defect or danger."***  *Id*. at 125 (emphasis added); *see also Carideo v. Dell, Inc*., 706 F. Supp.

29

obligation at all.  Defendants rely on a number of factually inapposite cases from a variety of contexts.  Plaintiffs will address those cases on a state-by-state basis.

1.   <u>Georgia Law</u>

As noted, Georgia law recognizes that the "particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover."  *Rivers*, 449 S.E.2d at 340.  Defendants argue that there was no duty here, however, because the fuel odor was "manifest and conspicuous."  This is a misleading argument, as the evidence clearly shows that no Plaintiff noticed a fuel smell before purchasing his or her vehicle.[17]  The issue is that Defendants had knowledge of a particular defect in the gaskets, which they concealed from consumers.  That knowledge related to the material from which the gasket was constructed—an "intrinsic quality" which no consumer could discover through ordinary prudence and caution.  Glossing over the directly applicable duty in *Rivers*, Defendants argue instead that, based on *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997), Georgia law does not impose

_____

2d 1122, 1133 (W.D. Wash. 2010) (plaintiffs adequately alleged duty to disclose under Washington law because when "a manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information").

[17] (McCabe Dep. at 38-39; Herring Dep. At 14; Stone Dep. At 24; Deuel Dep. At 26; Vo Dep. At 99.)

a duty on them to all downstream used car purchasers. However, the fraud theory presented in *Chudasama* is far afield of what Plaintiffs have shown here. In that case the plaintiffs alleged that they were misled by Mazda's advertising to believe that the minivan they purchased satisfied certain federal standards applicable to "cars" even though those federal standards did not actually apply to their minivan. *See id*. at n.39. The Eleventh Circuit stated that there was no precedent "that has recognized the fraud theory [the Chudasamas] allege (i.e., a fraud claim based on advertisements of a product that does not meet an inapplicable federal safety standard)." *Id*. (emphasis added) Among other problems with their claim, the court found that the advertisement they purportedly relied on was not false or misleading. *Id*. *Chudasama* has no application here, particularly since Georgia courts expressly recognize a duty to disclose under the circumstances here.

2.      Texas Law

        Defendants assert that under Texas law, a duty to disclose arises only "in four circumstances," none of which they contend apply here.[18] The circumstances here are precisely those in which Texas courts have recognized a duty to disclose. This is not a situation where Defendants sat passively by and allowed a situation to

---

[18] *See* Def. Br. at 10 (quoting *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App. 2010)).

unfold.  Rather, Defendants actively participated in creating the very situation that made disclosure necessary by selling a knowingly defective product while concealing its defect.

Defendants claim that the Texas Supreme Court's decision in *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004) is "virtually identical" to this case and that in *Armstrong* the court "expressly rejected" a duty to disclose to downstream purchasers.  *See* Def. Br. at 11-12.  Defendants are wrong on both counts.  *Armstrong* was a products liability case in which the plaintiff was involved in a severe accident after an unintended acceleration event.  Significantly, in that case NHTSA conducted an investigation and had determined that there was no defect in the subject vehicles and that the unintended acceleration events were the result of inadvertent driver error in stepping on the wrong pedal.  *Armstrong*, 145 S.W.3d at 135.  The jury returned a verdict for the plaintiff on each of her theories of liability.  *Id*. at 136.  The trial court rendered judgment on the jury's findings of product defects and negligence but rendered judgment notwithstanding the verdict on other theories, including fraud .  *Id*.

The vast majority of the court's opinion discussed the plaintiff's product liability theories.   After discussing those at length, the sum total of the court's discussion of all the other claims, including fraud, was as follows:

> Armstrong also argues the trial court erred in rendering judgment notwithstanding the verdict on her claims asserting fraud, negligent misrepresentation, breach of warranty, and violation of the DTPA. Armstrong obtained her car from her parents six years after they bought it from Nissan; Nissan had no involvement or pecuniary interest in the transaction. There was no evidence of any specific warranty or representation Nissan ever made to her, and no duty to disclose either. The trial court did not err in dismissing these claims.

*Id*. at 149.

Thus, Defendants make too much of the one sentence in *Armstrong* where the court stated that there was no duty to disclose in that case. *Armstrong* did not, as Defendants argue, "expressly reject" the existence of "a general duty to publicly disclose defects to all possible downstream used car purchasers." *See* Def. Br. at 11. Moreover, the "no duty to disclose" determination made sense under the particular facts presented in *Armstrong* where there was no evidence of a defect across a class of vehicles of which the defendant could have been aware.

Here, a safety defect was known to Defendants but unknowable to Plaintiffs and existed across an entire class of Defendants' vehicles. Under Texas law, fraud by omission occurs when "a party conceals or fails to disclose a material fact within the knowledge of that party" and "the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth." *See Bradford*, 48 S.W.3d at 754. There is ample evidence that Defendants concealed facts uniquely within their knowledge, whereas there was no such

evidence of knowledge of a defect in *Armstrong*.  Additionally, Texas courts have

recognized that sellers of real estate owe "a duty to disclose material facts that

would not be discoverable by the exercise of ordinary care and diligence on the

part of the purchaser or that a reasonable investigation and inquiry would not

uncover."[19]

3.    <u>Virginia Law</u>

With respect to Plaintiff Vo, Defendants argue that his fraud claim fails

because they did not actively conceal anything from him, and they had no duty to

disclose.  Defendants are incorrect on both counts.  Concealment of a material fact

is one way of showing the "misrepresentation" element of a fraud claim:

> For purposes of an action for fraud, concealment, whether
> accomplished by word or conduct, may be the equivalent of a false
> representation, because concealment always involves deliberate
> nondisclosure designed to prevent another from learning the truth.

*Van Deusen v. Snead*, 441 S.E.2d 207, 209 (1994).

In a later decision, the Virginia Supreme Court explained that concealment

requires "evidence of a knowing and a deliberate decision not to disclose a material

fact."  *Norris v. Mitchell*, 495 S.E.2d 809, 812 (1998).  The court discussed both

*Van Deusen* and *Spence v. Griffin*, 372 S.E.2d 595 (1988), another concealment

---

[19] *Domel v. Birdwell*, 2014 WL 4347815, at *6 (Tex. App. Aug. 29, 2014)
(citing *Smith v. Nat'l Resort Cmtys., Inc*., 585 S.W.2d 655, 658 (Tex.1979)).

case Defendants cite, at length and explained that in those cases the acts of concealment evidenced "a deliberate decision to conceal from the purchasers." *Norris*, 495 S.E.2d at 812. There is ample evidence here of Defendants' deliberate decision to conceal. Defendants were well aware long before any Plaintiff purchased his or her vehicle that ███████████████████████████ ████████████████. (Kempka Dep., p. 32:7-13) Defendants had already changed the gasket design at least once, and in some cases twice, before any Plaintiff's vehicle purchase. Defendants' failure to disclose this change to NHTSA and to consumers shows Defendants' campaign of concealment.

Defendants also argue that their silence regarding the defect cannot be actionable fraud because they did not have a duty to disclose. Defendants argue that they could not have had a duty to Vo because they were not a party to the transactions in which he bought his vehicles. Defendants' argument is largely based on the Restatement (Second) of Contracts § 161, which they argue that the Virginia Supreme Court "adopted" in *Spence v. Griffin*, 372 S.E.2d 595 (1988). *See* Def. Br. at 44. In fact, the *Spence* court cited that Restatement section in support of the proposition, already discussed above, that "[a] contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud." *See* Spence, 372 S.E.2d at 599. As

35

already discussed above, there is sufficient evidence of Defendants' knowledge and deliberate nondisclosure here.

Neither *Spence* nor any other Virginia precedent that Defendants cite require the direct contact between Defendants and Vo that Defendants suggest. In fact, Virginia law is just the opposite, as Virginia courts have repeatedly recognized that automobile sellers, in particular, have duties to subsequent purchasers. For example, in *Alexander v. Southeastern Wholesale Corp*., 978 F.Supp.2d 615 (E.D.Va. 2013), the court held that the plaintiff stated a fraud claim against a remote seller of an automobile. In that case, the defendant sold a vehicle with a false odometer certification to another automobile dealer who then sold the car to the plaintiff. *Id*. at 616. The defendant moved to dismiss the plaintiff's fraud claim on the basis that it had not made any misrepresentation to the plaintiff on which the plaintiff could rely. The court rejected this argument, noting that ***there is no requirement of privity or direct contact***. Rather, ***a fraud claim is proper if "the defendant knew or had reason to know that the plaintiff would rely on the misrepresentation."*** *Id*. at 623. (emphasis added) Citing other Virginia cases, the court concluded that a fraud claim may be brought against a remote seller where "a

36

remote seller knew or had reason to know that a subsequent purchaser would rely on the misrepresentation." *Id*.[20]

This case is similar to *Alexander* in that there is evidence that Defendants had specific knowledge of a defect of which only they could be aware. In concealing that defect, it was clear that subsequent purchasers such as Vo would rely on this omission. This proved to be especially true for Vo and the other Plaintiffs, who had to incur out-of-pocket expenses for replacement of the defective part.[21]

---

[20] The case of *Samuels v. Fredericksburg Motorcars*, 44 Va. Cir. 98 (Va. Cit. Ct. 1997) that Defendants cite, is not on point and was distinguished by the court in 2013 in *Alexander*. In *Samuels*, the plaintiff purchased an automobile from Fredericksburg Motorcars which he claimed should have been branded as "salvage" rather than repaired and resold. *Id*. at 98. The plaintiff's fraud claim was against the individual who performed repairs on the vehicle and sold it to Worldwide Auto, which then consigned the car to Fredericksburg Motorcars who sold it to the plaintiff. *Id*. at 99. The court dismissed the fraud claim holding that the remote seller was not "answerable in fraud to [plaintiff] under the circumstances alleged." *Id*. The court found that the defendant "did not know or have reason to know that [plaintiff] would become a subsequent purchaser of the car." *Id*. In *Alexander*, the court specifically distinguished *Samuels* because the plaintiff's complaint in *Alexander* specifically alleged that "the Defendant had actual or constructive knowledge about (1) the inaccuracy, and (2) the likelihood that consumers would rely on that misrepresentation." *Alexander*, 978 F.Supp. 2d at 623.

[21] *McMillion v. Dryvit Systems, Inc.*, 552 S.E.2d 364 (Va. 2001), that Defendants cite is inapposite. In that case, **the court expressly declined to address a fraud claim** premised on a manufacturer's failure to disclose known defects because the

**D.      Genuine Issues of Material Fact Exist on Defendants' Intent to
Deceive Plaintiffs (McCabe, Stone, Deuel)**

Defendants argue that they did not intend to deceive Plaintiffs McCabe,

Stone, or Deuel because they did not know about the existence of the individual

Plaintiffs. This argument fails because it ignores the evidence of Defendants' intent

to deceive all W211 owners and purchasers, including the named Plaintiffs.

First, Defendants changed the gasket design, twice, to use two different

fluorine-rubber materials, in addition to changing the supplier and never made this

publicly known.  That Defendants also hid this change from NHTSA is additional

evidence of an intent to deceive.  Moreover, each Plaintiff presented his or her

vehicle to a Mercedes authorized dealer and was charged to replace the defective

gaskets, thus giving Defendants an economic motive for their fraud.  In each

situation, Defendants represented to Plaintiffs that this gasket replacement was

something that individual owners were responsible to cover, rather than a defective

part that they had inadequately designed.  Moreover, direct evidence of

Defendants' intent to deceive appears in the testimony of former Mercedes service

advisor Shipley, who was instructed to cover the fuel smell with coffee grounds

and told not to tell the owner.  Further, MBUSA regional supervisor Craig Dearing

---

plaintiffs did not include this theory in their amended pleading.  *Id*. at 368.
*McMillion* offers no support to Defendants.

instructed dealers that "less is best" in connection with responding to a request for information from NHTSA.  (Dearing Dep., p.150:3-151:19).

Defendants cite *Exxon Corp. v. Emerald Oil & Gas Co*., 348 S.W.3d 194 (Tex. 2011), to argue that they cannot be liable to Stone and Deuel because they did not know who they were and therefore did not specifically intend to induce them to purchase their vehicles.  *See* Def. Br. at 14.  Defendants' reading of Texas law on this point is too narrow.  *Exxon* was an oil and gas dispute between the royalty owners and lessees of certain oil and gas tracts and a former lessee of those tracts.  *Exxon Corp.*, 348 S.W.3d at 198.  The plaintiffs brought a variety of claims against the defendant former lessees, including fraud claims based on misrepresentations that the defendants made in public filings.  *Id*. at 216.  The Supreme Court held that the trial court should not have entered a directed verdict for Exxon on the intent to induce reliance element because there was some evidence that Exxon knew "of an especial likelihood that the identified future operators would rely on the inaccurate [] reports."  *Id*. at 217.  In so holding, the court discussed section 531 of the Restatement at length and noted that Texas fraud law is in accord with that section.  *Id*. at 218-19.

That section of the Restatement provides:

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to

> expect to act or to refrain from action in reliance upon the
> misrepresentation, for pecuniary loss suffered by them through their
> justifiable reliance in the type of transaction in which he intends or
> has reason to expect their conduct to be influenced.

Restat 2d of Torts, § 531.  The comments to the section explain that it also applies

to a "class of persons" that the maker of the misrepresentation intends or has

reason to expect will act in reliance upon it:

> The maker may have reason to expect that his misrepresentation will
> reach any of a class of persons, although he does not know the identity
> of the person whom it will reach or indeed of any individual in the
> class. . . . *The class may include a rather large group, such as
> potential* sellers, *buyers*, creditors, lenders or investors, *or others who
> may be expected to enter into dealings in reliance upon the
> misrepresentation*.

> Restat 2d of Torts, § 531, cmt. e. (emphasis added)

This case is nothing like *Exxon,* which concerned the extent to which a party

could be liable to third parties for its statements in a public filing.  The court was

concerned with the possibility of "open[ing] the cause of action to any person who

subsequently relied on any public filings—including stocks and bonds, security

interests, real property deeds, and tax filings—with few limits in sight."  *Exxon*

*Corp.*, 348 S.W.3d at 219.  Accordingly, the court stated: the "[i]ntent-to-induce

reliance is not satisfied by evidence that a misrepresentation may be read in the

future by some unknown member of the public or of a specific industry."  *Id.*

Here, Defendants sell automobiles.  Defendants have every reason to expect that misrepresentations they make about defects in their vehicles, or their efforts to conceal such defects, will influence the decisions of purchasers of their vehicles. In this situation, Texas law does not require that Defendants were aware of the specific identity of individual purchasers.[22]

A federal district court in Texas applied these concepts in *Mid States Dev., L.L.C. v. Fid. Nat'l Title Ins. Co*., 2001 WL 1172215 (N.D. Tex. Sept. 28, 2001), and specifically rejected the same argument that Defendants make here.  In that case, the magistrate judge's report held that the defendants could not have made a representation with the intent to induce the plaintiff's action because neither defendant "was ever aware of Plaintiffs' existence."  *Id*. at *3.  The district court rejected this recommendation as an inappropriate application of Texas law.  The court held instead that under the "reason to expect" test there was a genuine issue of material fact as to whether the defendant "intended his alleged misrepresentations to reach borrowers such as Plaintiffs." *Id*. at *4.

---

[22] *See, e.g., Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co*., 51 S.W.3d 573, 580 (Tex. 2001) (concluding that section 531's "reason to expect" standard comports with Texas law and specifically overruling *Kanon v. Methodist Hospital*, 9 S.W.3d 365, 372 (Tex. App. 1999), which had held that "[f]or a misrepresentation to be actionable, the maker must intend to influence the very person to whom he makes the representation").

Defendants' argument that they could not have intended to induce reliance by any individual Plaintiff because they were not personally dealing with any Plaintiff is the same argument that Texas courts have rejected.  Defendants' argument would turn fraud law on its head, allowing fraud as long as it is widespread to the public at-large.  Importantly, Defendants have not offered anything to contradict the evidence that they intended to deceive an entire class of persons, including Mercedes owners and purchasers.

### E.    Evidence Exists to Show Genuine Issues of Material Fact on Proximate Cause (All Plaintiffs)

Defendants argue that they are entitled to summary judgment on all Plaintiffs' claims because there are no genuine issues of material fact on proximate cause.  This argument is similar to Defendants' argument that they did not intend to defraud *any particular* Plaintiff.  Defendants' argument is essentially that they could not have been the proximate cause of any individual Plaintiff's purchasing decision because they were not involved in the transactions and did not communicate with any Plaintiff (they instead defrauded the public in general).

 Defendants again seek to capitalize on the breadth of their fraud.  Under Defendants' theory, a seller who offers one defective item to an individual buyer faces greater liability than Defendants who knowingly offered 281,000 defective cars to the market.

42

Defendants' reasoning does not support summary judgment on the element of causation.  "Proximate cause is properly reserved for the jury and can only be appropriately addressed on summary judgment in plain and indisputable cases." *Schernekau v. McNabb*, 220 Ga. App. 772, 773, 470 S.E.2d 296, 298 (1996).  The gist of Defendants' proximate cause argument is that, even if they had made appropriate disclosures, the disclosures would not have reached the individual Plaintiffs.  Asking for such a pre-trial, factual ruling is a significant request from Defendants:  they ask the Court to hold that any hypothetical disclosures they could have made would not have reached any Plaintiff as a matter of law.

The only evidence Defendants offer on this point is to state that each Plaintiff did not communicate directly with Defendants.  In fact, however, this is untrue.  First, it mischaracterizes the evidence as Defendants cite to deposition testimony wherein Defendants asked each Plaintiff if he or she specifically called Daimler or Mercedes-Benz USA before purchasing their vehicles.  Defendants' suggestion that Plaintiffs cannot demonstrate proximate cause because they did not telephone Daimler headquarters in Germany or MBUSA ignores the realities of modern sales transactions.  Significantly, several of the Plaintiffs did speak to authorized dealers, which were conveying information from Defendants about what would be covered by Mercedes and what would not, and that no defect

43

existed.  Plaintiff McCabe did in fact write to MBUSA directly seeking assistance

with the fuel leak.  (McCabe Dep. at p.61:12-21).  Plaintiffs Vo and Herring

purchased their vehicles from authorized dealers.  (Herring Dep. at 16:10-16; Vo

Dep. at 21:10-13).  Plaintiff Stone called the Mercedes Benz dealership where the

vehicle he purchased had previously been serviced and spoke to the dealership's

service manager to learn about the service history of the vehicle.  (Stone Dep. at

29-30).  At the very least, all performed research before making their vehicle

purchases by, for example, performing internet research on Mercedes vehicles and

in on-line forums of Mercedes owners, reviewing Carfax or vehicle history reports,

or having the vehicle inspected.[23]  And although currently only a putative class

action, undoubtedly many members of the class of Mercedes E-Class owners

performed some level of Google or other research about their prospective

purchases.  Defendants simply have not shown that information regarding the

defect, if disclosed, could not have, as a matter of law, reached Plaintiffs.

Additionally, each Plaintiff did present his or her vehicle to a Mercedes-

Benz authorized dealership before incurring any costs of repair or replacement.

---

[23] Plaintiff McCabe took the vehicle he purchased to the mechanic that had performed work on his other Mercedes for a pre-sale inspection.  (McCabe Dep. at 35:11-36:10).  Plaintiff Deuel selected Mercedes "based on the promise that they were reliable and he looked at things like Consumer Reports to verify reliability. (Deuel Dep. at 14).   Deuel also reviewed a Carfax report that the used car dealership provided him before purchasing his vehicle (Deuel Dep. at 21:2-7).

Thus, Defendants had another distinct opportunity to disclose this information to each Plaintiff.  If Defendants had not concealed the defect, no Plaintiff would have incurred the out-of-pocket expenses to have the gaskets replaced.

**F.   Evidence Shows Genuine Issues of Material Fact on Justifiable Reliance (McCabe, Herring)**

Defendants argue that McCabe and Herring, cannot establish justifiable reliance.  For McCabe, Defendants argue that his fraud claim fails because he failed to exercise due diligence to discover the defect.

Here, the defect at issue is with a specific gasket.  This defect, and the secret changes in the gasket, was only discovered after the Plaintiffs' hired a Ph.D. chemist from Vanderbilt University to test the gaskets.  The idea that Mr. McCabe or the average vehicle owner should be able to discover this problem on his or her own in an exercise of due diligence is laughable.  The due diligence obligation only requires a plaintiff to ascertain facts that are reasonably available to both parties.  It does not require Plaintiffs to ascertain facts such as these that were uniquely available to Defendants.  Rather, the principle of due diligence applies:

> where the person relying on the fraud as a basis for the action had equal and ample opportunity to prevent the happening of the occurrence, and made it possible through a failure to exercise proper diligence.  ***It does not apply if the person defrauded lacks equal facilities for ascertaining the truth,*** as where the facts are peculiarly within the knowledge of the speaker and are difficult for the hearer to ascertain, as where misrepresentations relate to latent defects, ***where***

***the employment of an expert would be required,*** or where from the
circumstances attending the transaction the hearer is compelled to rely
on the speaker's statements. (emphasis added)

*Macon Chrysler-Plymouth v. Sentell*, 179 Ga. App. 754, 754-755; 347 S.E.2d 639,

641(1986).

As to Ms. Herring, Defendants seek to re-cast her fraud claim as a warranty

claim and then argue why that claim fails.  Defendants' arguments make little

sense.  First, Defendants fault Herring for deposition testimony wherein she

expressed an opinion that certain vehicle parts should last for the lifetime of the

vehicle.  Defendants' derision of Ms. Herring for this testimony is remarkable

given that Daimler's own corporate representative testified that ██████████

███████████████████████████████.  (Kempka Dep., p. 47)

Ms. Herring's claim—like the other named Plaintiffs—is one for fraudulent

concealment.  Her claim is not that Defendants were responsible for making

unlimited repairs to her vehicle.  Rather, Plaintiffs have presented evidence that

Defendants had specific knowledge of a particular defect and they concealed this

from Mercedes owners and purchasers.  As a result, Plaintiff Herring, like the other

Plaintiffs, was damaged when Defendants refused to acknowledge the defect and

to cover the replacement, instead imposing that cost on consumers.

**G.   Evidence Exists to Create Genuine Issues of Material Fact on Damages (Stone and Vo)**

Defendants argue that Plaintiff Stone has no damages because he did not incur any out-of-pocket costs for repairs and because he did not re-sell his vehicle at a discount for any fuel-related defect.  In fact, Stone did incur out-of-pocket expenses because he paid a third party for a warranty plan that covered the repairs to his vehicle.  Had he not paid out-of-pocket for a third-party warranty (i.e. to a company other than Defendants), he would have had to pay out-of-pocket for the defective parts directly.  Defendants fail to cite any authority for the proposition that Stone's claim fails because he paid a third party to make the repairs rather than paying Defendants directly.

The argument that Stone suffered no damages because the resale value of his car did not account for any fuel-related defect also fails to establish that Defendants are entitled to summary judgment.  Stone testified that he was operating under the assumption that the repairs had fixed the problem.  Stone disclosed those repairs when he sold his car. He believed those repairs fixed the problem.  When he sold the vehicle, he informed the buyer of the fact that many Mercedes vehicles were experiencing fuel leak issues and that he believed he had this problem addressed in his vehicle.  There is nothing under-handed about

Stone's actions, despite what Defendants seek to imply.  (Stone Dep., p. 85:20-87:17; Hayse Dep. P. 14:6-9, 17-21).

Defendants' argument that Mr. Vo paid nothing out of pocket for one of the two E Class purchases is without merit.  First, he only has to have damages for one car to have a fraud claim.  Mr. Vo's other E Class was just out of warranty when he bought it with approximately 55,000 miles.  (Vo Dep., p. 96).  He later had to pay out-of-pocket $950 to have the fuel sending unit and the two gaskets replaced, so he has clearly realized damages with his this E Class.  (Vo Dep., p. 102).  Second, the repair that the dealer performed under warranty on Mr. Vo's other E Class did not fix the fuel smell; he is still experiencing it.  (Vo Dep., p. 73).  Finally, apart from the repair costs, a defect such as this diminishes the value of both of Mr. Vo's E Class cars, as evidenced by the nearly $4000 that Mercedes' dealer deducted from Ms. Herring's trade in due to the fuel issue.  (Ex. 3 to Herring Dep.).  Thus, all of the Plaintiffs and putative class members have suffered damage from the diminished value of their cars due to the defect.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 754 F. Supp. 2d 1145, 1161-1163 (C.D. Cal. 2010) (citing Cole v. General Motors Corp., 484 F.3d 717, 722-23 (5th Cir. 2007).

**H.    Herring's Trade In of Her Vehicle To Mercedes Does Not Raise Any Evidentiary Issues that Warrant Summary Judgment**

Finally, Defendants argue that they are entitled to summary judgment as to Ms. Herring because she "failed to preserve her vehicle and the parts at issue." *See* Def. Br. at 36-38.  This argument employs Defendants' common tactic of blaming the Plaintiff.  Herring took her vehicle to an authorized Mercedes dealer after she noticed a strong fuel smell. (Herring Dep., p.10:11-11:18) Defendants' authorized dealer told her it would cost her almost $3,000 to repair the vehicle, including replacing the fuel tank, without disclosing that her fuel leak was perhaps due to defective gaskets of Mercedes' own design.  When Herring declined to pay these costs, Defendants' dealer said she could not leave in her car because the fuel leak was a safety issue.  (Herring Dep., p.27:5-23).  Herring decided to trade in her car, and Mercedes' dealer deducted nearly $4,000 from the trade in value due to the fuel smell.  All of this occurred before Herring had any thought of this lawsuit.  Moreover, Herring turned the car over to <u>Defendants'</u> authorized dealer.

Defendants also fault Herring for taking her car to a repair shop that was not an authorized Mercedes dealer for a period of time and failing to preserve maintenance records from those visits.  However, Defendants questioned Herring about those repairs in her deposition and nothing prevented Defendants from obtaining those records from the repair shop.  Herring also did not experience the

fuel smell until the day before she took her vehicle to the Mercedes dealer.  Thus, there is no reason to believe that any "improper conduct" by Herring or the third-party repair shop had any influence on the fuel system.  And, indeed, Herring presented her car to an authorized Mercedes-Benz dealer the day after she noticed the problem so Defendants had an immediate opportunity to inspect and take note of any such issues.

Defendants argue that there is no way of knowing whether Herring's car experienced a defect because of her trade in. However, Ms. Herring experienced the identical fuel smell issue as thousands of other E-Class owners.  Moreover, Plaintiffs have presented evidence that the problem related to the material that Defendants used in the gasket design, which was common across all W211 E-class vehicles.  (*See generally* Dunn Aff; *see also* Exhibit I (Non-party Mercedes owner declarations.)  Plaintiffs have presented ample evidence to create an issue of fact that the gasket defect in the W211 E-Class vehicles was common across all vehicles, including Ms. Herring's.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' Omnibus Motion for Summary Judgment must be denied.

This 5th day of December, 2014.

50

CONLEY GRIGGS PARTIN LLP

/s/      Ranse M. Partin
Cale Conley
Georgia Bar No. 181080
Ranse M. Partin
Georgia Bar No. 556260

The Hardin Building
1380 West Paces Ferry Road
Suite 2100
Atlanta, Georgia 30327
Telephone:   404-467-1155
Facsimile:   404-467-1166
cale@conleygriggs.com
ranse@conleygriggs.com

WIGINGTON RUMLEY DUNN &
RITCH, L.L.P.

Joseph M. Dunn
Texas Bar No. 06245650

601 Howard Street
San Antonio, Texas 78212
Telephone:   210-487-7500
Telecopier:   210-487-7501
jdunn@wigrum.com

*COUNSEL FOR PLAINTIFFS*

51

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I hereby certify that I have filed the foregoing document via CM/ECF with the Clerk of Court, which will automatically send notice of said filing via electronic mail to the following counsel of record:

Stephen B. Devereaux, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E., Suite 1700
Atlanta, Georgia  30309-3521
sdevereaux@kslaw.com
**Counsel for Defendants**

Pursuant to Rule 7.1(D) of the Local Rules of the Northern District of Georgia, the undersigned further certifies that the foregoing was prepared in font and point selection approved by this Court and authorized by Local Rule 5.1(B).

This 5th day of December, 2014.

**CONLEY GRIGGS PARTIN LLP**

/s/      Ranse M. Partin
Ranse M. Partin
Georgia Bar No. 556260

The Hardin Building
1380 West Paces Ferry Road, N.W., Suite 2100
Atlanta, Georgia 30327
Telephone:  404-467-1155
Facsimile:   404-467-1166
ranse@conleygriggs.com